**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

DENNIS MILLER,                )        CASE NO. 1:19CV0288
                             )
              Plaintiff,      )
                             )
        v.                    )        MAGISTRATE JUDGE
                             )        JONATHAN D. GREENBERG
ANDREW SAUL,                  )
Commissioner of Social Security, )
                             )        **MEMORANDUM OF OPINION**
              Defendant.      )        **AND ORDER**
                             )

   Plaintiff, Dennis Miller ("Plaintiff" or "Miller"), challenges the final decision of Defendant,

Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his combined

application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act,

42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C.

§ 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2). For the reasons set forth

below, the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

   In October 2009, Miller filed an application for SSI, alleging a disability onset date of

November 1, 1998. (Transcript ("Tr.") at 154-155.) The application was denied initially and upon

reconsideration, and Miller requested a hearing before an administrative law judge ("ALJ"). (Tr.

---

   [1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

100-101.)

On July 19, 2011, an ALJ held a hearing, during which Miller, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.* at 2195.) On February 24, 2012, the ALJ issued a written decision finding Plaintiff was not disabled. (*Id.* at 9-32). The ALJ's decision became final on June 21, 2013, when the Appeals Council declined further review. (*Id.* at 1-3.) Miller appealed that decision to the District Court, and on August 12, 2014, the Court vacated the ALJ's decision and remanded the matter for further proceedings. (*Id.* at 2285.) The Appeals Council implemented the Court's decision by issuing an order of remand that directed the ALJ to consolidate the remanded application with a second application for SSI benefits, filed on August 5, 2014, and issue a unified decision on both applications. (*Id.* at 2397-98, 2328.)

The ALJ held a second hearing on March 29, 2016, during which Miller, represented by counsel, and a VE testified. (*Id.* at 2225.) On August 31, 2016, the ALJ issued a written decision finding Plaintiff was disabled from September 29, 2010 through February 28, 2012. (*Id.* at 2154-94.) The ALJ' s decision became final on January 10, 2017, when the Appeals Council declined further review. (*Id.* at 2146-49.)

On February 7, 2019, Miller filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 12 & 15). Miller asserts the following assignment of error:

    (1)    The ALJ erred in finding that Plaintiff was no longer disabled as of February 29, 2012 based upon a finding that medical improvement had occurred.

(Doc. No. 12.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Miller was born in June 1971 and was a "younger" person under social security regulations at the time of both of his administrative hearings. (Tr. 2183; Doc. No. 12 at 4.) *See* 20 C.F.R. §§ 404.1563 & 416.963. He has a high school education and is able to communicate in English. (Tr. 2183.) He has no past relevant work. (*Id.*)

### B.    Relevant Medical Evidence[2]

#### 1.    Mental Impairments

The ALJ identified bipolar disorder, intermittent explosive disorder, and antisocial personality disorder as severe impairments, and, on remand, the ALJ was directed to (and did) address findings of the state agency reviewing psychologists. (*Id.* at 2159, 2163.) However, Miller chose not to cite or discuss any evidence relating to his mental impairments in his Brief, so the Court will not recite it here.

#### 2.    Physical Impairments

In November 1998, Miller injured his back while carrying a full 40-gallon hot water tank, estimated to weigh 150 pounds, down a flight of stairs. (*Id.* at 332.) He fell down the stairs, "landed on his tailbone and exploded 3 discs in his lower back." (*Id.* at 546.)

On July 11, 2000, after extensive non-operative treatment failed to alleviate Miller's back pain, Dr. Jerold Gurley performed an anterior lumbar interbody fusion, L4-L5 and L5-S1, at Lutheran Hospital. (*Id.* at 261.) Following this surgery, Miller fell, and his back pain resumed. (*Id.* at 256.)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

An MRI taken on October 11, 2000, showed thickening of the nerve roots suggestive of arachnoiditis, and mild left foraminal narrowing. (*Id.*) A lumbar spine CT performed on March 28, 2001 was "equivocal," showing no loosening or implant failure, but some gas lucency at the L5-S1 and degenerative changes. (*Id.* at 227-28.)

In October 2001, Dr. Gurley operated again to remove Miller's spinal instrumentation. (*Id.* at 710.) He found evidence of pseudoarthrosis and a failed fusion at L5-S1. (*Id.*)

Dr. Gurley operated a third time in November 2001 because Miller's wound had become infected and needed to be irrigated and debrided. (*Id.* at 693.)

On February 19, 2002, Dr. Gurley performed a trigger point injection to treat pain at Miller's bone graft site and neuroma. (*Id.* at 674.)

In March 2002, Miller began to see Dr. Charles Choi at the Fairview Hospital Pain Management Center for treatment of his back pain. (*Id.* at 1211.) Dr. Choi initially treated Miller with medication and epidural steroid injections, but these did not provide lasting improvement. (*Id.*)

A CT scan of Miller's lumbar spine performed in May 2002 showed solid bony fusion with no evidence of lucency or stenosis, and some narrowing at L5-S1. (*Id.* at 631.)

In July 2002, Dr. Choi concluded that scar tissue from Miller's laminectomy was impinging on his lumbar nerve root, "causing severe pain and dramatically altering [his] ability to do normal activities of daily living." (*Id.*) Dr. Choi recommended a dorsal (spinal) column stimulator. (*Id.*)

On July 29, 2002, physical therapist Ellen Straub performed a functional capacity evaluation. (*Id.* at 548-554.) She found that Miller was unable to lift anything greater than 10 pounds, and unable to squat, climb, or crouch. (*Id.*) She opined that he was limited to "occasional" sitting,

standing, walking, lifting, reaching, and kneeling. (*Id.* at 553.) Under the category of vital signs she wrote, "No work: do not lift anything greater than 10 pounds." (*Id.* at 548.)

In December 2002, an x-ray of Miller's spine showed loss of disc space height at L4-L5 and L5-S1 and degenerative changes to the endplates at L5-S1. (*Id.* at 322.)

In August through November 2003, Miller received multiple therapeutic nerve blocks, but reported only "a little" improvement in his ability to function, although they did "help with pain + swelling." (*Id.* at 367-69, 374-75, 436-37.)

An EMG performed on November 26, 2003, showed a mild right S1 nerve root entrapment, and slower H-reflex response in Miller's right leg when compared to both normative standards and his left leg. (*Id.* at 321.)

On February 5, 2004, Dr. Gordon Zellers evaluated Miller's records and examined him in connection with his worker's compensation claim. (*Id.* at 1135-40.) Dr. Zellers opined that Miller's recovery from the 1998 injury was "fair to poor," and recommended that he be evaluated for implantation of a spinal cord simulator, as he had reached the level of maximum medical improvement possible with surgery and other treatments. (*Id.* at 1140.) He opined that Miller was limited to sedentary activities, with a five-pound maximum lifting limit, and no prolonged sitting, standing, or ambulatory activities, and no climbing, bending, or exposure to hazards. (*Id.*)

On February 17, 2004, physical therapist Aryeh Weiss performed a functional capacity evaluation of Miller. (*Id.* at 802-809.) Her findings were similar to those of the 2002 functional capacity evaluation: she opined that he was limited to sedentary activity with only "occasional" standing, walking, and kneeling. (*Id.*) She also noted that his primary limiting factor was a refusal to put forth maximal effort. (*Id.*)

On October 25, 2004, Dr. Karl Metz performed an independent medical examination on Miller in connection with his worker's compensation claim. (*Id.* at 624-27, 761.) Dr. Metz concluded that the February 2004 functional capacity evaluation was "a reasonably accurate assessment of [Miller's] capabilities." (*Id.* at 761.) He opined that Miller's back injury had reached "maximum medical improvement" and was unlikely to improve further, and his conditioning had deteriorated to the point that he "is not capable of returning to the workforce at this time." (*Id.* at 627.)

In November 2004, Miller was evaluated by the Cleveland Clinic's Pain Medicine Center. (*Id.* at 611-13.) Miller reported that he spent 20 hours a day reclining, and showed "severe functional impairment" on the Pain Disability Index. (*Id.* at 612.)

An x-ray taken in December 2005 showed mild spondylosis at L2. (*Id.* at 588.)

On September 13, 2006, Dr. Louis Keppler surgically removed Miller's spinal fusion hardware. (*Id.* at 297.) On October 26, 2006, Dr. Keppler noted that Miller's "x-rays look great. His wound is well healed." (*Id.* at 289.) He recommended a comprehensive rehabilitation program to address Miller's "markedly deconditioned state," and opined "although he may never be perfect physically, there is certainly room for improvement in his condition with appropriate training." (*Id.* at 290.)

An x-ray taken in August 2008 showed grade 1 retrolisthesis of L3 on L4, likely associated with the fusion created by Miller's earlier surgery. (*Id.* at 958.)

An x-ray taken in September 2008 showed facet osteoarthropathy at L3-4 without further pathology. (*Id.* at 984.)

In October 2009, Miller broke his right wrist in a motorcycle crash. (*Id.* at 1283.) On October 23, Dr. Alix Rosenstein at MetroHealth manually set and immobilized his fracture, but noted "continued poor alignment and joint dislocation" on x-rays and recommended Miller be admitted for operative repair. (*Id.* at 1286.) Miller declined admission, but agreed to consider outpatient surgery.[3] (*Id.*)

On November 5, 2009, Miller went to the Emergency Department at St. John's Hospital complaining of tightness in his cast and swelling in his fingers. (*Id.* at 1437.) The doctor there made two cuts in his cast to relieve the pressure, wrapped it with an ace bandage for stability, and proscribed more Percocet. (*Id.* at 1437-40.)

On November 9, 2009, Miller returned to MetroHealth complaining of pain in his wrist and seeking additional narcotics. (*Id.* at 1279.)

On November 18, 2009, Miller again returned to MetroHealth, where "slight swelling" was noted around his right wrist, and a new cast was applied. (*Id.* at 1277-78.)

On December 7, 2009, Miller went to the Emergency Department at St. John's, where the doctor noted a reduced range of motion in his right wrist and numbness in his pinky finger, and diagnosed right wrist tendinitis. (*Id.* at 1419-21.) He was given a wrist splint. (*Id.* at 1421.)

On February 8, 2010, Miller was seen by Dr. Ryan Garcia at the MetroHealth Orthotics Department. (*Id.* at 1518.) He reported pain in his right wrist and believed it was infected. (*Id.*) Dr. Garcia observed diffuse swelling and tenderness around Miller's wrist, and a reduced range of

---

[3] Miller does not cite records showing this surgery took place, but the Court notes that hardware placed in Miller's wrist failed and needed to be replaced in February 2010. (Tr. 1512.)

motion. (*Id.*) He noted that Miller had not participated in Occupational Therapy since his injury. (*Id.*)

On February 16, 2010, Dr. Kevin Malone at MetroHealth operated on Miller's wrist to replace failed hardware in his wrist fracture. (*Id.* at 1512-13.) A March 15, 2010 examination showed wounds "healing nicely," with no evidence of inflamation or irritation, and "near full" range of motion in Miller's fingers. (*Id.* at 1505.) On March 29, Dr. Malone removed the frame and provided a wrist brace. (*Id.* at 1502.) At an April visit, Dr. Amar Mutnal at MetroHealth reported that Miller still had pain in his wrist, and advised him that radiocarpal fusion would be a future option if he could stop smoking and using nicotine products completely. (*Id.* at 1604.)

On June 7, 2010, Miller was seen by Dr. Aphrodite Papadakis in MetroHealth's Family Practice Department. (*Id.* at 1596.) His primary complaint was swelling in his foot and leg, but he also reported numbness in his right thumb, middle, and index fingers. (*Id.*)

From June 14-15, 2010, Miller was admitted to Fairview Hospital for antibiotic treatment of leg cellulitis related to the unhealed wound on his left leg. (*Id.* at 1957-58.)

On July 16, 2010, Miller sought treatment of his leg at the Family Practice Department of MetroHealth. (*Id.* at 1665.) The doctors noted slight swelling, but no sign of infection, and recommended Miller elevate his feet and avoid prolonged standing or crossing his legs. (*Id.* at 1668.)

An August 17, 2010 x-ray of his right wrist showed no evidence of an acute fracture, but a "progression of findings associated with scapholunate ligament disruption." (*Id.* at 1681.)

On September 29, 2010, Miller was admitted to Fairview Hospital after a head-on collision with a semi truck fractured his left femur. (*Id.* at 1932.) The fracture required surgery, and from

September 29 - October 5, Miller was treated at Fairview Hospital. (*Id.* at 1929-41.) From October 20-23, Miller was again admitted to Fairview Hospital and treated for a possible infection of his left knee. (*Id.* at 1702.)

On November 27, 2010. Miller was treated for injury pain at St. John Medical Center. (*Id.* at 1678.) X-rays showed a fracture in the fixation screw used to repair his fractured femur, although the fracture was otherwise healing well. (*Id.*).

On January 19, 2011, an MRI of Miller's left knee showed subtle chondral fissuring of the patellar apex. (*Id.* at 2001.) On January 24, Miller went to the Emergency Department at Lutheran Hospital for treatment of pain in his left thigh, and the examination showed laxity and medical stress in his knee. (*Id.* at 1801.) An x-ray taken that day showed that the rod aligning his fracture had broken, although the alignment of the bone was unchanged. (*Id.* at 1807.)

On March 3, 2011, Dr. Brendan Patterson, an Orthopaedic surgeon at MetroHealth, operated to remove the implant in Miller's left femur, which had failed to heal and become infected. (*Id.* at 2547-49.)

On September 14, 2012, Miller saw Dr. Patterson for a follow up evaluation of his left femur, which had been broken. (*Id.* at 2504.) Dr. Patterson noted that Miller's left leg was 1.5" shorter than his right, a difference "currently accommodated by a . . . internal shoe lift." (*Id.*) Miller told Dr. Patterson that he was "having difficulty with falling," and had "fallen several times over the past few months." (*Id.*) Since his femur had healed, Dr. Patterson referred Miller for a neurological evaluation. (*Id.*)

On October 1, 2012, Dr. Mark Winkleman, a neurologist at MetroHealth, evaluated Miller. (*Id.* at 2498.) Miller told him that his falls began a year ago, and were monthly at first, but now

occurred on a weekly basis. (*Id.*) Miller said his falls were all alike: he would be standing and walking when suddenly his right leg gave way, causing him to fall. (*Id.*) Dr. Winkleman was puzzled by Miller's condition, but noted decreased pinprick sensation in Miller's right foot and leg, and observed that Miller was unable to tandem walk. (*Id.* at 2501.) He also noted that Miller suggested additional pain medication might help. (*Id.*)

In January 2013, Miller returned to Dr. Keppler for the first time since 2007, complaining of severe back and leg pain. (*Id.* at 3276.) On February 13, 2013, Dr. Keppler performed another lumbar fusion on Miller, this time at the L3-4 level. (*Id.* at 3321.) After the surgery, Dr. Keppler noted that Miller' analgesic use "exceeded our expertise in pain management" and referred Miller to a pain management specialist, explaining:

> A fusion surgery takes anywhere from 6-9 months to heal. Simply to get over the surgery itself takes about three months for the incision to heal, inside and out. For three months, he is to avoid absolutely no bending, lifting or twisting. At the present time all he is permitted to do is walk.

(*Id.* at 3277.)

On April 6, 2013, Miller was seen at the emergency department at St. John's and Westshore Hospital complaining of back and left knee pain after falling down stairs. (*Id.* at 3207.) He explained that he had run out of his Percocet that day and couldn't wait for his next refill because of the increased pain. (*Id.*) X-rays taken April 7, 2013, showed no acute changes to either his back or knee. (*Id.* at 3210.) Dr. Marc Baumguard noted that Miller should have had 5 more days of Percocet if he was taking it as prescribed, and declined to give him more, offering Naprosyn instead. (*Id.*)

On April 15, 2013, Miller was seen by Dr. Sherif Salama, a pain management specialist, for a new patient evaluation.  (*Id.* at 3299.)  He described aching, stabbing pain on a level of 7-8 on a 10-point scale.  (*Id.*)  Dr. Salama noted Miller's antalgic gait, favoring the left side, decreased range of motion in his lumbar spine, decreased strength in his left hip, and a lack of patellar reflex in his left knee.  (*Id.* at 3300-02.)

On December 26, 2013, Miller returned to Dr. Keppler, reporting pain in his knee and back after a recent fall while lifting a snow plow at work. (*Id.* at 3286.)  An x-ray taken that day showed good fusion at L3-4, but slight spondylisthesis above the fusion.  (*Id.*)

In February 2014, Miller reported to a nurse that he had been doing "increased shoveling and snow work and has aggravated both his lumbar spine and his left knee, and most recently his right knee." (*Id.* at 3287.)  She gave him a corticosteroid injection in his right knee and recommended that he follow up with Dr. Keppler "if his knee conditions continue to be bothersome." (*Id.*)  X-rays of Miller's knee taken on February 16 showed the rod was in place despite a broken screw and mild degenerative changes.  (*Id.* at 3256.)

On March 17 and April 14, 2014, Dr. Keppler saw Miller for complaints relating to continued pain in his left knee and back.  (*Id.* at 3289-90.)  X-rays in March showed that the spinal "fusion appears solid," but there was some retrolisthesis noted at the level above his fusion.  (*Id.* at 3289.)  A full body bone scan reviewed in April showed possible arthritic changes in his lumbar spine.  (*Id.* at 3290.)  Dr. Keppler recommended arthroscopic examination of Miller's knee and joint or paraspinal injections at the L2 level of Miller's spine.  (*Id.*)

On August 18, 2014, Miller was examined by Dr. Charles Choi, a pain management specialist. (*Id.* at 3298.) Dr. Choi noted "absent" deep tendon reflexes in Miller's knees and ankles and "markedly diminished" range of motion. (*Id.*)

On October 15, 2014, Miller was scheduled for surgery again, but Dr. Keppler sustained an injury while preparing to operate, so the procedure was rescheduled. (*Id.* at 3338.)

On December 8, 2014, Dr. James Anderson performed the surgery: a re-exploration of Miller's old spinal wound, removal of the rod, decompression at 2-3 level with foraminotomies, and complete disc excision at the 2-3 level with interbody fusion. (*Id.* at 3372.) He noted that the previous fusions "all looked fine." (*Id.*)

On January 7, 2015, Miller went to the Emergency Department at Fairview Hospital complaining of worsening back pain and respiratory distress. (*Id.* at 3539.) He was diagnosed with pneumonia, admitted to the hospital for 9 days, and treated with IV antibiotics. (*Id.*)

Miller saw Dr. Anderson for a post-surgical evaluation on February 27, 2015. (*Id.* at 3617.)

Dr. Anderson noted that Dr. Choi had refused to treat Miller in his pain management program because he believed Miller was diverting his drugs. (*Id.*) Miller was accompanied to the appointment by a woman whom he had accused of stealing his narcotics. (*Id.*) Dr. Anderson prescribed additional Percocet for Miller while trying to get him into another pain management program. (*Id.*) Dr. Anderson observed that a recent MRI showed Miller had a small compression fracture at L1, a slight retrolithesis at L1-2, and a small disc protrusion on his left side. (*Id.*) He noted that "this is not a surgical anomaly, but it is something that could be causing increased back pain and some hip area pain." (*Id.*)

From April 2015 through at least March 2016, Miller received primary care at the Med Care Group. (*Id.* at 3917-3979.)[4]

On May 3, 2015, Miller went to the Emergency Department at St. John Medical Center following a physical altercation with police officers responding to a report of domestic violence at his home. (*Id.* at 3788.) He reported that a police officer had kicked him in the spine and his pain was now so severe he was unable to walk. (*Id.*) He had been unable to get into another pain management program, but got Percocet proscribed by his dentist, which he reported had been stolen by his wife. (*Id.*) An x-ray taken that day showed a "suspicious small chip fracture of L2 that appears to be new since x-rays of 5 months ago." (*Id.*) The x-ray also showed "progressive degenerative disc narrowing at L1-L2 and new retrolisthesis at that level." (*Id.* at 3764.)

On July 10, 2015, Dr. Keppler performed a bilateral facet block injection at L1-2 on Miller's spine. (*Id.* at 3769.)

Records of a February 4, 2016 visit to Parma Heathspan show a diagnosis of postlaminectomy syndrome of the lumbar region and pain disorder with psychological features. (*Id.* at 3985.)

**C.     State Agency Reports - Physical Impairments**[5]

In March 2010, Dr. W. Jerry McCloud, a state agency reviewing physician, reviewed Miller's

---

[4] In Miller's Brief, he identifies his new general practitioner as Dr. Sankar, although the Med Care Group records are unsigned. (Doc. No. 12 at 13.) According to the record which does identify him, Dr. Sankar was a doctor at Healthspan Parma, where Miller received treatment numerous times before it closed in March 2016. (*Id.* at 3979-4004.)

[5] As mentioned in Section B.1. *infra*, Miller did not raise any assignments of error cite any evidence, or make any arguments relating to his mental health impairments. Therefore, the Court is not considering them here.

records and determined that Miller had the following limitations:

- lift 20 pounds occasionally and 10 pounds frequently;

- sit, stand, or walk for 6 hours of an 8-hour day if allowed to alternate between sitting and standing every hour;

- never use foot controls because of his right leg injuries;

- occasionally climb ramps and stairs, kneel or crawl;

- never climb ladders, ropes or scaffolds; and

- limited in fingering and feeling due to his wrist injury.

(*Id.* at 1476-78.) Dr. McCloud noted that Miller's description of his limitations was contradicted by his description of his daily activies. (*Id.* at 1480.) For example, Miller's application stated that he "can not lift or carry anything due to his back injury, however during initial clarifying call he reported that he can cook and do laundry," and he reported "that he avoids bending [or] sitting for long periods of time but he is able to drive and ride a motorcycle." (*Id.*)

On June 29, 2010, another state reviewing physician, Dr. Gerald Klyop, affirmed Dr. McCloud's findings. (*Id.* at 1658.)

On December 10, 2014, Dr. Teresita Cruz evaluated Miller's records and found that the medical file had new and material changes since the prior ALJ decision. (*Id.* at 2299.) Dr. Cruz determined that Miller had the following limitations:

- lift 20 pounds occasionally and 10 pounds frequently;

- sit, stand, or walk for 6 hours of an 8-hour day with normal breaks;

- occasionally climb ramps and stairs, or kneel;

- never crouch, crawl, or climb ladders, ropes or scaffolds; and

14

- avoid concentrated exposure to hazards.

(*Id.* at 2297-99.)

On May 12, 2015, Dr. Diane Manos, a state reviewing physician, reviewed Miller's records, including new records from December 2014 and February 2015, and reached substantially similar conclusions as Dr. Cruz, except that instead of limiting Miller to "never" crouching and crawling, she opined he could "occasionally" perform these actions.  (*Id.* at 2317-19.)

**D.  Hearing Testimony[6]**

During the March 29, 2016 hearing, Miller testified to the following:

- He lives in North Olmstead, Ohio, with his girlfriend.  (*Id.* at 2228.)

- He drove himself to the hearing, and maintains a valid driver's license.  (*Id.*)

- He has a GED.  (*Id.* at 2229.)

- He smokes half a pack a day, but no longer drinks or uses illegal drugs.  (*Id.*)

- At home, he cooks occasionally, and will put the laundry into the washer, but not fold the clothes.  (*Id.*)

- He never takes out the trash, but sometimes sweeps or uses a vacuum cleaner.  (*Id.* at 2230.)

- He shops and can push a cart around the store, unless "it's bad," in which case he uses the motorized cart.  (*Id.*)

- He takes about three showers a week.  (*Id.*)

---

[6]  In his Brief, Miller asserts that "the hearing testimony is not implicated in any of Plaintiff's assigned errors," and therefore omits it as "superfluous."  (Doc. No. 12 at 16.) Miller does not challenge the ALJ's finding that he was not disabled prior to September 29, 2010.  Therefore, the Court agrees that it is not necessary to recite the testimony given at Miller's September 19, 2011 hearing.  However, the Court will discuss the testimony in Miller's second hearing, on March 29, 2016, to the extent it is the basis for the ALJ's decision that Miller was not disabled after February 29, 2012, which is at issue here.

- He has a dog that he walks regularly. (*Id.*)

- His typical day involves waking up and drinking lots of coffee, driving his girlfriend to work, going home and watching tv, visiting his sister's house, and walking the dog. Sometimes he takes 20 or 30 minute naps, because he has trouble sleeping at night. (*Id.* at 2231-32.)

- He has conflicts with his neighbors, who he believes dislike his dog and want to get him evicted. (*Id.* at 2232.)

- He used to do auto body and mechanical work for his grandfather, but didn't report that income. He enjoyed that work. (*Id.* at 2233.)

- He believes that "It's not that I can't work, because there are probably some things I can do," but he doesn't believe he can work consistently, because activity exacerbates his pain. (*Id.*)

- He has severe low back pain, left hip pain and left knee pain. (*Id.* at 2234.)

- He doesn't get along with people and cannot be in crowded areas, because they make him panic. (*Id.*)

- He had counseling before, but stopped in September because "I just get tired of stuff sometimes." (*Id.* at 2235.)

- He lives in a third floor walk-up apartment, and taking the stairs aggravates his pain. Lengthy walks, sitting too long, standing too long, and lifting too much also make his pain worse. (*Id.*)

- When he's in pain, sometimes he stretches. Physical therapy didn't help him, but aquatherapy did. There is a pool behind his apartment and in the summer he swims, which helps somewhat. (*Id.* at 2236.)

- Injections only help for 30 days, but he is not allowed to have them that frequently. (*Id.*)

- His medications make him tired, "a little loopy at times," and off balance. (*Id.* at 2237.)

- He thinks he could lift 10 to 15 pounds periodically throughout the day, stand 45 minutes to an hour before he needs to sit, and walk for 10 or 15 minutes before he needs to stop. Sometimes he is comfortable sitting all day. (*Id.* at 2237-38.)

16

- He can carry objects in his right hand, but cannot write for lengthy periods of time. (*Id.* at 2238.)

- He can't kneel on his left knee, but can crawl as long as he doesn't put too much pressure on that knee. (*Id.* at 2238-39.)

- He was addicted to his pain medications, but is now trying to take them as prescribed, understanding that managing his pain will be a lifelong issue. (*Id.* at 2245-46.)

- He sees his girlfriend, sister, and mother frequently, and has one close friend who he sees about twice a month. He will either go to the friend's house, or the friend will come over. (*Id.* at 2247.)

The VE testified Miller had no vocational history. (*Id*. at 2250.) The ALJ then posed the following hypothetical question:

> [A]ssume a hypothetical person of the same age and education as Mr. Miller and this person is able to lift and carry 20 pounds occasionally, ten pounds frequently. This person could stand and walk for six hours and sit for six, but could use a sit/stand option every hour that lasts for about five minutes, but they don't have to leave the workstation at that time. This person can occasionally climb stairs and ramps, but no ladders, ropes or scaffolding. This person can occasionally balance, stoop, kneel, crouch and crawl. This person can frequently reach in all directions and can frequently handle, finger and fell. This person is not exposed to unprotected heights or moving machinery and should perform simple, routine tasks with simple, short instructions, make simple decisions, have few workplace changes. This person is not required to work in a fast paced production quota environment and is having superficial interaction with coworkers and supervisors. No interaction with the public. Superficial refers to the intensity of the interaction, so there's no need for negotiations or confrontations. Would you be able to identify work in the regional or national economy for such a person?

(*Id.* at 2250-51.)

The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as housekeeping cleaner, mail clerk, and clerical assistant. (*Id.* at 2251.)

The ALJ then posed a second hypothetical question:

[A]ssume a hypothetical person who is only able to lift and carry ten pounds occasionally, who can stand and walk for two hours in an eight-hour day and sit for six. They still need a sit/stand option. This time its every 30 minutes, but it only lasts for one minute. Again, they're not leaving the workstation. They can occasionally climb stairs and ramps, no ladders, ropes or scaffolding. They can occasionally balance, stoop, crouch, but there is no kneeling or crawling. Again, they're frequently reaching in all directions and frequently handling, fingering and feeling. The environmental and mental limitations remain the same. . . . Would you be able to identify any work in the regional or national economy for such a person?

(*Id.* at 2251-52.)

The VE testified the hypothetical individual would be able to perform representative jobs as a document specialist or a food and beverage order clerk. (*Id.*) Miller's attorney asked how his response would change if this hypothetical individual could not interact with the general public in phone or in person, and the VE replied that the individual could still perform the job of document specialist. (*Id.* at 2254.)

The ALJ next asked whether the limitations requiring the hypothetical individual to spend at least 15 percent of the workday off task, or take three extra, unscheduled 15 minute breaks would that impact any of the jobs the VE mentioned. (*Id.* at 2252-53.) The VE testified that this limitation would exclude all work in the economy. (*Id.*)

### III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      The claimant has not engaged in substantial gainful activity since November 3, 1998, the alleged onset date (20 CFR 416.920(b) and 416.971 *et seq*).

2.      From September 29, 2010 through February 28, 2012, the period during which the claimant was under a disability, the claimant had the following severe impairments: degenerative disc disease of the lumbar spine, status post left femur fracture with ORIF, status post right wrist fracture with ORIF, and bipolar disorder (20 CFR 416.920(c)).

3.  From September 29, 2010 through February 28, 2012, the period during which the claimant was disabled, the severity of the claimant's left femur fracture met the criteria of section 1.06 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d) and 416.925).

4.  The claimant was under a disability, as defined by the Social Security Act, from September 29, 2010 through February 28, 2012 (20 CFR 416.920(d)).

5.  The claimant's substance use disorder(s) is not a contributing factor material to the determination of disability (20 CFR 416.935).

6.  The claimant has developed new impairments since February 29, 2012, the date the claimant's disability ended. Thus, the claimant has the additional severe impairments that are present after February 28, 2012. In addition to the severe impairments of degenerative disc disease of the lumbar spine, status post left femur fracture with ORIF, status post right wrist fracture with ORIF, and bipolar disorder; the claimant has severe medically determinable impairments of: diabetes mellitus, hypertension, intermittent explosive disorder, antisocial personality disorder, and polysubstance abuse disorder in reported remission.

7.  Beginning November 3, 1998, the alleged onset date of disability to September 29, 2010 and then beginning February 29, 2012, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.994(b)(5)(i)).

8.  Medical improvement occurred as of February 29, 2012, the date the claimant's disability ended (20 CFR 416.994(b)(1)(i)).

9.  The medical improvement that has occurred is related to the ability to work because the claimant no longer has an impairment or combination of impairments that meets or medically equals the severity of a listing (20 CFR 416.994(b)(2)(iv)(A)).

10. After careful consideration of the entire record, the undersigned finds that, beginning November 3, 1998 to September 29, 2010 and then beginning February 29, 2012, the claimant has had the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that he can sit/walk 6-hours in and 8-hour day and sit 6 hours in an 8-hour day. He requires a sit/stand option every hour for 5 minutes but does not have to leave the workstation at that time. He can occasionally climb stairs and ramps, but never climb ladders, ropes or scaffolds. He can occasionally balance, stoop,

kneel, crouch and crawl. He can frequently reach in all directions and frequently handle, finger and feel. He needs to avoid unprotected heights and moving machinery. He can perform simple, routine tasks with simple short instructions, make simple decisions, have few workplace changes, and no fast production quotas. He can have superficial interaction with coworkers and supervisors, but no interaction with the public. Superficial refers to the intensity of the interaction so no negotiation or arbitration.

11.     The claimant is unable to perform past relevant work (20CFR 416.965).

12.     Since November 3, 1998, the claimant has been a younger individual age 18-49 (20 CFR 416.963).

13.     The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

14.     Transferability of job skills is not an issue in this case because the claimant does not have past relevant work (20 CFR 416.968).

15.     From November 3, 1998, the alleged onset date to September 29, 2010 and then beginning February 29, 2012, considering the claimant's age, education, work experience, and residual functional capacity, there have been jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

16.     The claimant was not disabled from November 3, 1998 to September 29, 2010. The claimant was disabled from September 29, 2010, through February 28, 2012. The claimant's disability ended February 29, 2012 (20 CFR 416.994(b)(5)(vii)).

(Tr. 2162-84.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of*

*Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v.*

*Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld

where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10 cv 734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10 CV 017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09 cv 1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

In his brief, Miller argues that the ALJ erred in determining that he was no longer disabled as of February 29, 2012, based upon a finding that medical improvement had occurred. (Doc. No. 12 at 17.) He alleges that the ALJ's analysis on the issue of medical improvement is inadequate because it focuses only on Miller's fractured femur, and does not discuss whether Miller's other impairments might still have rendered him disabled after his femur healed.[7] (*Id.* at 18.) To support the claim that he remained disabled, Miller focuses on evidence relating to three area of physical

---

[7] The Court notes that the brief omits any discussion of the standard for medical improvement or the applicable regulations.

impairment: his lumbar disc herniation and subsequent multiple back surgeries fusing vertebrae from L3-S1; his right wrist fracture and dislocation; and his left leg fracture and knee injuries. (*Id.* at 5-16.)

In response, the Commissioner asserts that the ALJ supported his findings of residual functional capacity ("RFC") with substantial evidence. (Doc. No. 15 at 4.) He notes that the ALJ spent more than 14 single-spaced pages discussing the medical, opinion and other evidence in the over 4,000 page record. (*Id.* at 5.) He argues that the ALJ did not limit her review to the fractured femur, as demonstrated by her through discussion of the evidence, and the ALJ's finding that Miller had multiple severe impairments following his medical improvement date, including degenerative disc disease of the lumbar spine, status post right wrist fracture with surgery, bipolar disorder, diabetes, hypertension, intermittent explosive disorder, antisocial personality disorder, and polysubstance use disorder in remission. (*Id.*)

The procedure for making a finding of medical improvement is set forth in 20 C.F.R. §§ 404.1594 and 416.994. The first step is determining whether medical improvement has been demonstrated. "A claimant's disability benefits may be terminated if there has been any medical improvement, if the improvement is related to the ability to work, and if the claimant is currently able to engage in substantial gainful activity." *Watts v. Comm'r of Soc. Sec.*, 179 F. App'x 290, 292 (6th Cir. 2006), citing 20 C.F.R. § 404.1594(a). "Medical improvement" is "any decrease in the medical severity of . . . impairment(s) [that] was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled." *Id.*, quoting 20 C.F.R. § 404.1594(b)(1). A finding of medical improvement "must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s)." *Kennedy v.*

*Astrue*, 247 F. App'x 761, 765 (6th Cir. 2007), (quoting 20 C.F.R. § 404.1594(b)(1)). The medical improvement must be related to the claimant's ability to work. The regulations state that a medical improvement is only related to an claimant's ability to work "if there has been a decrease in the severity . . . of the impairment(s) present at the time of the most recent favorable medical decision and an increase in your functional capacity to do basic work activities." *Id.*, (quoting 20 C.F.R. § 404.1594(b)(3)), *see also Nierzwick v. Comm'r of Soc. Sec.,* 7 Fed. App'x 358 (6th Cir. 2001).

The second step in determining medical improvement requires establishing that the claimant is able to engage in substantial gainful activity. As the Sixth Circuit explains, the implementing regulations for this step incorporate many of the standards set forth in regulations governing initial disability determinations, with one significant difference: the ultimate burden of proof lies with the Commissioner in termination proceedings.[8] *Kennedy*, 247 F. App'x at 765, citing 20 C.F.R. § 404.1594(b)(5) and (f)(7); *Griego v. Sullivan*, 940 F.2d 942, 944 (5th Cir. 1991).

The Sixth Circuit has made clear that demonstrating a claimant still experiences "pain and medical problems that have been labeled 'severe'" will not preclude a finding of medical improvement. *Watts,* 179 F. App'x at 293-94. In *Watts v. Comm'r of Soc. Sec.*, 179 F. App'x 290 (6th Cir. 2006), the Circuit Court considered an appeal by a claimant who had previously been

---

[8] Unlike the cases cited here, this case is not a "termination proceeding." There is no prior, binding decision in this case because the original ALJ opinion was reversed and remanded at the District Court in *Miller v. Commissioner*, 1:13-cv-1872 (N.D. Ohio August 12, 2014). Nonetheless, the Court will follow the guidance of termination of benefit cases here, as they provide a framework for assessing medical improvement. The Court does not have to reach the issue of who bears the burden of proof in this situation because, as discussed *infra,* the Commissioner meets the burden, proving by medical evidence that Miller's femur improved.

judged disabled based on degenerative disc disease, congenital fusion of the cervical spine, two ruptured discs, thoracic outlet syndrome, chronic pain in her legs and back and migraine headaches. Since the finding of disability, the claimant developed new impairments - depression and respiratory problems - that were not a part of her original application. *Watts,* 179 F. App'x at 294. The Court explained that for purposes of determining whether medical improvement has occurred, it is proper to "look primarily to evidence demonstrating the improvement in the thoracic outlet syndrome and back pain that formed the basis of [the claimant's] original application." *Id.*

Our case is unusual because the ALJ was asked to assess Miller over a 10-year period, and thus the disability determination and the finding of medical improvement occurred in the same decision. However, the Circuit Court's guidance in *Watts* is instructive because it generally describes the procedure the ALJ followed in this case. In subsection three of her opinion, she focuses on explaining her determination that Miller's left femur fracture met the criteria of section 1.06 of 20 CFR Part 404, Subpart P, Appendix 1 for a limited period of time, and lays out the basis for her determination that medical improvement of this disabling condition occurred. (Tr. 2163-65.) In support of his assertion that the ALJ narrowly focused her opinion on the injury to Miller's leg, Miller quotes from this section, which does focus exclusively on Miller's fractured femur. However it constitutes less than three pages of a twenty-seven page opinion.

The other medical impairments that Miller alleges the ALJ overlooked, or failed to consider in combination with his fractured femur, are discussed at length elsewhere in the opinion. They were all important elements of a disability determination, but not central to the determination of whether

medical improvement occurred in Miller's disabling femur fracture.[9]

Substantial evidence support's the ALJ's determination that Miller's femur had improved by February 28, 2012. On September 29, 2010, the date the ALJ first determined he was disabled, Miller was admitted to Fairview Hospital following a head-on collision with a semi truck. (Tr. 1933.) The ALJ notes that an x-ray taken of his left femur that day showed "a transverse fracture in the distal third of the femoral shaft." (*Id.*) He underwent surgery for placement of a rod and screws before he was discharged on October 5, 2010, with instructions to use crutches. (*Id.* at 1939-41.) Unfortunately, by January 2011, x-rays showed that the rod aligning his fracture had broken, and he had a second operation on his leg on March 3, 2011. (*Id.* at 1807, 2547-49.) To document medical improvement in Miller's leg, the ALJ cited medical records, including notes from examinations performed on February 20 and 29, 2012, in which Miller is described as "walking with a limp favoring left side" because of a "leg length discrepancy" and "ambulating without assistance." (Tr. 3263, 3266.) At the examination on February 20, Miller's spine and sacroiliac joints were not tender when palpated, and motor function and reflexes in his legs were symmetrical. (*Id.* at 3266.) At the examination on February 29, Miller showed "minimal weakness on the left lower extremity,"

---

[9] Miller also objects that the ALJ gave no weight to medical opinions prior to September 29, 2010, "because these opinions were prior to the claimant's left femur fracture." (Doc. No. 12 at 18.) However, his assignment of error only implicates the ALJ's finding of medical improvement. He does not explain why he feels those early opinions should have been given greater weight, or develop an argument that he was disabled prior to September 29, 2010. The Court therefore restricts its analysis to the issue of medical improvement and whether substantial evidence supports the ALJ's finding of non-disability after February 28, 2012. *See McPherson v. Kelsey*, 125 F.3d 989, 995 96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.")

but the examining doctor noted "questionable patient's effort." (*Id.* at 3263.)  The ALJ also cited an April 16, 2012 x-ray that showed Miller's femur was fully healed.  (*Id.* at 2505.)

Miller does not make any substantive argument that his femur did not improve.[10]  Instead, he argues that despite the fact that his femur had healed, his other ailments combined to render him disabled after February 28, 2012.  The ALJ properly addressed these other impairments not in her assessment of medical improvement, but in subsections 7-9 of her opinion, where she sets forth the evidence supporting her determination that Miller "has not had an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1," and her finding of RFC.  (*Id.* at 2167-83.)

The ALJ began her analysis by reviewing the workplace injury that led to Miller's back impairment in November 1998.  (*Id.* at 2169.)  She discussed Miller's fusion surgeries, and trigger point block injections.  (*Id.* at 2169-71.)  She also noted that the medical record is mixed.  Although it is clear that at times Miller's back ailments severely limited his functioning, the ALJ also cited exams showing periods of  "normal motor strength, sensory and reflex signs." (*Id.* at 2169.)  In February 2013 and December 2014, Miller had additional fusion surgeries.[11]  (*Id.* at 2172.)  Miller

_____

[10]  Miller does argue that "he continued to experience pain in the left knee and leg." (Doc. No. 12 at 20.)  Miller made numerous trips to various doctors with subjective reports of pain.  However, both medical records and his own testimony show that he was abusing his prescription pain medications throughout much of this time, and many of his reports of pain were difficult to support with objective medical evidence.  (*See, e.g.,* Tr. 2245-46, 3210, 3284, 3617.)

[11] Although he did not raise it as an assignment of error, Miller assets in his argument that the ALJ improperly gave "little weight" to an opinion by his treating physician restricting him "no bending, lifting or twisting" for three months following his February 2013 surgery.  (Doc. No. 12 at 19.)  Miller acknowledges that this opinion "was only (by its terms) operational for three months," but asserts the ALJ should have used other medical records to determine it was still relevant after that time, and given a more through

asserts that the need for the second surgery reflects the fact that his "low back did not improve" in the intervening year and eleven months. (Doc. No. 12 at 19.) However, the ALJ supports her determination that this was not a continuous period of disability with medical exam records showing that, in December 2013, Miller sought treatment for knee pain he ascribed to lifting a snowplow at work. (Tr. 2174.)

Similarly, the ALJ discusses the broken wrist that Miller suffered after a motorcycle accident on October 18, 2009, and the difficult recovery after this injury. (*Id.* at 2171.) He required a second surgery four months later, in February 2010, because the hardware in Miller's wrist had failed. (*Id.* at 1512-13.) However, by the end of March, the injury was reportedly well-healed. (*Id.* at 1502.) In August 2010, the Miller fell and re-fractured his wrist. (*Id.* at 2172.)

Finally, the ALJ considered the knee injuries which Miller asserts she overlooked. She notes that in February 2014, Miller went to the ER after slipping on ice, and x-rays showed either

---

explanation of why this opinion by his treating physician was discounted. The Commissioner point out that the ALJ's opinion thoroughly sets forth her reasoning for assigning weight to all the other treating physician opinions in the record. (Doc. No. 15 at 6.) The opinion not only stated that Miller's movement was restricted for only three months, it also stated that Miller's fusion surgery would be "fully healed" within "6-9 months." (*Id.* at 3277.) The short duration of the opinion is a reasonable basis for giving it "little weight," because even if it was adopted it could not establish 12-months of disability. If Miller believed Dr. Keppler would have extended his opinion beyond the three-month period, the burden was on him to provide that evidence. *See, e.g., Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997) ("Claimant has the ultimate burden of proving the existence of a disability.") Further, it is reasonable that the ALJ cited this opinion as evidence that Miller no longer needed an ambulatory assist, since it also stated "walking is all [Miller] is permitted to do." (Tr. 2165.)

"a positive patella fracture or a bipartite patella,"[12] as well as "mild degenerative changes." (*Id.* at 2172, 3256.) He had an arthroscopy of the patellofemoral chrondoplasty performed on May 6, 2014. (*Id.* at 2173.) In evaluating the severity of his knee injury, the ALJ noted that Miller returned to the ER ten days after the initial accident and "was not observed to be using crutches or ambulating with an abnormal gait." (*Id.*) A follow up examination of his knee showed "no acute abnormal findings." (*Id.* at 2173.)

In her decision, the ALJ explained that she evaluated the medical evidence "showing varying pathology of decreased range of motion, impaired muscle strength decreased sensation and positive straight leg raises," in the context of other evidence in the record which showed Miller "has retained the ability to engage in activities of daily living including working and riding a motorcycle." (*Id.* at 2175.) Throughout the period in which the ALJ determined Miller was no longer disabled,[13] the record shows Miller was engaging in activities that evidenced functional capacity: shoveling and "snow work" in December 2013 and February 2014; lifting an air conditioner in July 2015; and working on cars in June and September 2015 and February 2016. (*Id.* at 2170-74.) Miller testified that he walked his dog daily. (*Id.* at 2230.) Substantial evidence supports the ALJ's conclusion that although Miller's physical impairments were severe, "the claimant's ability to maintain a relatively active lifestyle suggests his physical findings do not prevent him from engaging in all activities." (*Id.* at 2175.)

---

[12]  Records not cited by the ALJ explain that Miller "has a bipartite patella which can sometimes be confused as a fracture when compared to previous x-rays." (Tr. 3288.)

[13]  The ALJ noted similar evidence for the period before he fractured his femur: biking and walking in 2005, working on his truck in December 2005, changing a truck tire in October 2006, caring for his grandfather in 2008, lawn mowing and attending college classes in 2010. (Tr. 2170-74.)

Miller would like this Court to re-weigh the evidence in this case, which it may not do. The ALJ considered all of Miller's severe impairments and supported her conclusions with substantial evidence, including both objective medical evidence and reliable reports of Miller's activities of daily living. This places the determination that Miller was no longer disabled after February 28, 2012, squarely within the ALJ's zone of choice. Therefore the Commissioner's final decision must be AFFIRMED.

## VII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: December 3, 2019